IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 2, 2018

## WAFA BADAWI HINDIYEH v. WALEED FAWZI ABED

**Appeal from the Chancery Court for Rutherford County**
**No. 16CV-802      J. Mark Rogers, Judge[1]**

---

### No. M2017-00410-COA-R3-CV

---

This appeal arises from a divorce. Wafa Badawi Hindiyeh ("Wife") sued Waleed Fawzi Abed ("Husband") for divorce in the Chancery Court for Rutherford County ("the Trial Court"). After a trial, the Trial Court, *inter alia*, granted Wife a divorce, entered a permanent parenting plan with respect to the parties' minor son ("the Child") awarding Wife 285 days to Husband's 80, and awarded Wife a judgment for the value of a Cadillac less $2,500 Wife received on the sale of her original vehicle for a total judgment of $13,400. Husband appeals to this Court, arguing, among other things, that the Trial Court found no statutory factors applicable to justify such a paltry award of parenting time to him and that the Cadillac at issue was not even marital property subject to division. We vacate the Trial Court's judgment with respect to the residential parenting schedule and remand for the Trial Court to award Husband significantly more time with the Child. Finding that the Cadillac was not marital property, we modify the Trial Court's award of $13,400 to Wife to $2,000 to account for only the sale of Wife's original vehicle. We otherwise affirm the Trial Court. We, therefore, affirm as modified, in part, and vacate, in part, the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified, in Part, and Vacated, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Charles G. Ward, Murfreesboro, Tennessee, for the appellant, Waleed Fawzi Abed.

Sonya W. Henderson, Murfreesboro, Tennessee, for the appellee, Wafa Badawi Hindiyeh.

---

[1] Assigned this case following the recusal of Chancellor Howard W. Wilson.

# OPINION

## Background

Husband and Wife were married in October 2013.  Husband was age 26 at trial and is originally from Kuwait.  Wife, age 23 at trial, hails from Jordan.  The Child was born in December of 2015.  The parties lived in Smyrna, Tennessee during the marriage.

Husband works for Nissan in the Quality Control Department.  Wife did not work during the marriage but was a full-time student at Middle Tennessee State University.  Wife went on to earn her Master's Degree in Accounting.  Wife now works as an accountant for HCA in Nashville.  The parties purchased a house in Smyrna.  Husband's father and uncle own a body shop and contributed significant sums to Husband for the couple to live on during the marriage, including $47,000 for a down payment on their home.  These contributions are a point of contention on appeal.

Wife entered the marriage owning a 2004 Mercedes.  Husband later sold the Mercedes for $4,500, giving Wife $2,500 to use toward her tuition.  When Wife graduated from MTSU, Husband presented Wife with a Cadillac featuring a large bow on top.  However, the car was not titled in Husband's name but rather originated with Husband's father's business.  When the parties separated, Husband's father repossessed the Cadillac.  The Cadillac later was put up for sale at the price of $15,900.

In April 2016, the parties separated.  Wife filed for divorce in May 2016.  Wife and the Child went to live with Wife's mother.  Wife pays her mother $400 a month to watch the Child.  After a Pendent Lite hearing in July 2016, Husband was awarded visitation every other weekend from Saturday at 11:00 a.m. until 4:00 p.m. and Sunday from 11:00 a.m. until 5:00 p.m.

This case was tried in December of 2016.  Wife's mother, Tahani Quwaider, testified concerning Husband's behavior toward Wife:

Q. All right.  How long have you known Waleed Abed?
A. (Through interpreter)  Since -- since they engage, almost three years.
Q. All right.  Do you know of an occasion while they were married that you had to get your daughter in her pajamas because she had been thrown out of the house of Waleed Abed and her?
A. (Through interpreter)  Yes.  He kicked her out of house and he took -- took the wallet, the key -- her keys and left her without anything.
Q. And what?
A. (The interpreter)  Left her without anything, without any documents.

***

Q. Was she punished many times for associating with Americans?
A. (Through interpreter)  All the time, punished.  All the time.
Q. What punishments did she know of?
A. (Through interpreter)  Beating her up, threatening her, threw her away from home, and threatening by divorce.
Q. All over just hanging around Americans?
A. (Through interpreter)  Yes.  And preventing her from go out or if she liked to go to park with her son, is not allowed.  Everything is forbidden or not allowed.

Wife's mother testified further, this time regarding her babysitting the Child:

Q. So she gave some -- I have some documents.  So your daughter writes you a check to babysit her grandson -- her son?
A. (Through interpreter)  Yes.  Checks, yes.
Q. So she charges her own daughter to watch her grandson?
A. (Through interpreter)  She try to help her.
Q. So she doesn't give her -- pay her to watch her grandson?
A. (Through interpreter)  Yes, to take care of the child and be aware of the child.
Q. And her -- does her daughter live in her house with her?
A. (Through interpreter)  Yes, in the same house.
Q. Does she -- if her -- if her daughter doesn't pay her, is she going to throw her grandson out?
A. (Through interpreter) No, she's going to put him in his eyes and in her heart.
Q. So if she puts her in -- she puts her grandson in her eyes and her heart, why does she charge her daughter $500 to watch her own grandson?
A. (Through interpreter)  She saying it's better than babysit, you are going to take care of the child instead of to pay the babysit.  You are -- you will be better than anybody else.  You are going to be taking care of the child.
Q. So if the father watches the child and he doesn't charge anything, it saves her daughter money, does it not?
A. (Through interpreter)  She cannot trust in him because he tried to promise many things and she doesn't believe that.
Q. How much does she charge a week to watch her own grandson?
A. (Through interpreter)  Totally, per month, $400 a month.
Q. Does she charge her own daughter to stay in her house?

A. (Through interpreter)  Yes, she pay $500.

Q. Does she charge her own daughter for electric, water, gas, cable?

A. (Through interpreter)  Yes.  She helps.  Last month she helped, this month she helped.  She help always.

***

Q. Even if she doesn't get paid any money, is she going to continue to watch her grandson?

A. (Through interpreter)  Yes.

Q. Ask her if she'll do it for free.  Would she do that for free, watch her grandson?

A. (Through interpreter) She would put him in his eyes, but he has to manage that and to give this is -- he has to pay that too.

Q. Who is he?

A. (The interpreter)  The son-in-law.

Q. My question is, will she watch her grandson for free?  Is that yes or no, and then she can explain.

A. (Through interpreter)  Yes.

Wife testified as follows concerning the parties' finances during the marriage:

Q. And when you two purchased this home, you put $45,000 down; is that correct?

A. Yes, ma'am.

Q. The $45,000 came from where?

A. I put $2,000 and he put the rest.  He would -- his work from Nissan, and then he would sell -- buy and sell cars with his father. That's how he collected all that money.

Q. So that money actually came out of his checking account?

A. Uh-huh.

***

Q. All right.  Now, you -- 2014, 2015, 2016 -- first off, I will show this to your husband.  All of his checking accounts show -- statements where these -- there's money from cars being, whatever you call it, sold.

A. Uh-huh.

Q. Flipped, so to speak.

A. Uh-huh.

-4-

Q. And you guys have used that money for the whole time you were married?

A. Uh-huh. That's correct.

Q. That was normal?

A. Uh-huh.

Q. So this Cadillac -- well, let me back up. When you married him, did you own a car?

A. I did. Yeah, I had my own car.

Q. And what was it?

A. I had a 2004 Mercedes.

Q. And what did you do with the 2004 Mercedes?

A. He sold it later.

Q. Your husband sold it?

A. Well, he listed for sale without asking me, and then at the last minute, just before he went to show it to customers, he called me, he was like, I'm going to sell it. You can say yes or no. But there's people who want to buy it and they're serious. And he's like, I'm going to get you a different car, but yes or no. But -- well, they're already here. Yeah. But he didn't tell about listing it. I wasn't ready. I didn't have any other car at the moment. But, you know, he just put me under the pressure and I just said yes.

Q. And what did '04 Mercedes sell for?

A. 4500.

Q. And $4500, did he bring that to back to the house?

A. He did, yeah. He gave me that.

Q. And what happened to that money?

A. Then a few days later, his dad called him asking him for $2,000. I'm not sure why he didn't tell me. He was about to go to the bank and withdraw $2,000 to give to his dad, but he was like, instead of me going to the bank, can you give me the money now since you have cash at home and I'll bring it back to you whenever, like, you want to pull that money out. I was like, yeah, sure, you can do that. And he never paid me back.

Q. And the rest of the money was tuition?

A. Yeah, I put it on tuition.

Q. Okay. So when did the Cadillac show up as your new car?

A. I didn't receive it until after I graduated and had my son. It was supposed to be, like, a graduation gift.

Q. Did it have a bow on it?

A. It did, yeah.

Q. Did you know the car was titled in someone else's name?

A. I did know, yeah. It didn't actually have a title on it.

On cross-examination, Wife testified as follows regarding her objection to Husband having more time with the Child:

Q. So basically, you want the father not to have a -- not to see his son hardly at all for a whole year and let your son stay with your mother all day and have a good relationship with her?
A. I asked him, whenever I was applying to a job, whenever I had that internship, I told him since he goes to work at one and I go to work at, what, six in the morning -- when I lived in Smyrna, I would have to leave at 6:40 or 6:30, I told him, you can watch him from the time I leave until 12 p.m. and then take him to the daycare or take him to my mom's house or your mom's house, whoever's watching him. He was like, no, that's my job, that's your job. I don't -- I'm not going to change a diaper. I'm not going to feed the baby. That's your job. You're a woman and you're going to do that. If he really wants to see him, from -- and watch him in the morning, he would done that. He would have asked me, I can watch Fawzie whenever you're at work. He never asked me, never. So he's just saying that he's going to watch him without even asking.
Q. So if he get up there in this court and says, I want my son every other week. I want a solid week with my son, just like the mother has, is he entitled to that if he wants it? And he's going to raise his son.
A. But he was very emotionally abusive to me. He's like --
Q. I'm not asking about that. I'm asking, do you think he should be able to get a week with his son if he wants to spend that time with him? That's my question.
A. It's -- his job is very -- like, it's night shift. It's second shift. In the morning, okay, there's babysitters and -- but at night, who -- like, who's going to watch him. He's going to work from 2 p.m. to 10 p.m. --
Q. Well, what if it's -- so if he gets up there and says, my mother is going to watch my child --
A. His mother refused previously to watch him. That's why I asked my mom to watch him, and he refused my mom.

Husband testified on a number of topics, including the disputed point of his father's business vis-à-vis his income, as follows:

Q. Do you love your son?
A. Yes, absolutely.
Q. Why do you want 50-50 with your son? Why do you want that time?
A. I understand we're getting divorced and I'm okay with that, but I still love my son. I still love him and he's my top priority. I'll do anything for

him. He's -- he's very important to me. I'll make sure he's safe and provide everything he needs while he's with me.

*** 

Q. Mr. Abed, as you sit right now, are you attempting to get on days [at work]?
A. Yes, sir.
Q. Okay. And what shift would day shift be?
A. Six to 2:30 every day.
Q. All right. And what is preventing you from going to days as we speak now?
A. There's me and another individual on second shift, currently, and he's going to be off for about three -- about three months for a knee replacement. That's the only thing holding me back. When he gets back from his surgery, then I automatically go to day shift.
Q. That's -- before you go to day shift, if your son is with you and gets up at 6 a.m., who is with him?
A. Me.
Q. Okay. Until you go to work at 1:30, who is your son with?
A. With me.

*** 

Q. Did your dad give you money from time to time?
A. Several times, yes.
Q. Throughout your marriage, did your dad give you cash?
A. Yes.
Q. And what did you all use that for, you and your wife?
A. Bills.

*** 

Q. All right. When you and your wife were together, would you sometimes sell cars for your dad?
A. Yes.
Q. What kind of lot does he own?
A. Most of the cars are rebuilt titles. We have a -- he has a body shop and a mechanic shop and they do all the repairs there. They buy salvage cars and rebuild them, basically.
Q. So are salvage cars like junk cars?
A. No.

Q. Or is it cars that have been totaled?
A. Cars that have been wrecked and the insurance companies will list them online for businesses to purchase and rebuild.
Q. Okay. And from time to time, does he give you money from those cars when you and your wife were together?
A. Yes.
Q. Has he done it at all in 2016, at all? Have you done any car business at all?
A. Zero.
Q. Did you, at one time, do an Uber for a little while?
A. I did it twice, two days, and then I stopped.
Q. You heard her when she said there was a $200 payment to you -- $250 payment from Uber in September of 2016. What is that?
A. My brother-in-law signed up to drive for Uber and I referred him. So Uber paid me $200 -- I think it was 200 or 250 bonus because I referred him. I got that money.

On cross-examination, Husband testified as follows:

Q. So have you hit [Wife] in the leg and pinched her very hard?
A. I didn't pinch her very hard. We both exchanged pinches on one occasion. She pinched me and I lightly pinched her back. There was no hitting.

***

Q. Now, you have testified that the 2014 deposits, which I've added up to be around $31,520, or an average of an extra twenty-six twenty six a month, were for your home purchase. Is that your testimony?
A. Yes.
Q. All right. Then you purchased this home, but you're still getting deposits for 2015 that total about $19,020, or an extra $1585 month. These deposits are from sales of cars, are they not?
A. They were given -- funds given to me by my father and uncle when they sold a vehicle.
Q. Your father doesn't own anything. From your uncle?
A. Yes.
Q. You already bought the house. They sell a vehicle, they give you $19,000. Why?
A. I didn't make enough to pay the bills and all the upkeep and her credit card payment that I pay every month. I didn't make enough to get by.

Q. You two have little debt. She had that one credit card, you don't have any, right? No car payments. No payments whatsoever, except a house payment. And how much was that?

A. It's 1274 now.

Q. All right. 1274 a month, the house payment. Let's add another 800 -- maybe $2,000 a month you need for that. Maybe groceries. $3,000 dollars a month. You are making more than that working at Nissan. Would you disagree with me? Where's the money going?

A. My net is 660 a week. I broke even most months.

Q. So you wouldn't give me anything here for 2016. So how much money have they been giving for this year?

A. There's nothing for this year.

Q. Why? How do you get by? You can't get by, remember?

A. Because I only providing for myself right now. I don't have to pay her credit card every month and --

Q. Her credit card didn't have enough on it to put you in the hole.

A. It was four, $500, plus I paid her Chase card about five months before she left.

Q. So without her in the house, you no longer need this extra 20 or 30,000 a year. Is that what you're telling the Court? And you're not getting it anymore?

A. No, I'm not getting anything.

***

Q. Mr. Abed, those, what I've just shown you, these are a couple of those deposits. That's all I received, for some reason. In 2014, the checks were written out to you by United Auto and they would have specific cars written on them. Why is that?

A. Those funds came from those vehicles sold, that's why.

Q. Why put that on there for you? I mean, if it's a gift, what difference does it make?

A. It's just the record for them to know. I mean, that's the vehicle my uncle and my father sold. That's where the funds came from. That's the only reason that's on there.

Husband's father, Fawzi Abed, testified regarding his financial assistance to Husband as follows:

Q. For the years 2014, 2015, what do you think you made then?

A. I made 20, 24, 26,000; that's it.

Q. That's all?
A. Yes.
Q. Then --
A. One month I sell five cars, three cars, one month zero car. Didn't sell nothing.
Q. Oh, I understand.
A. It's dead. Business is not good.
Q. So how does your son manage to get 30,000 in 2014 off of your business if you're only making 20?
A. What is that? I'm sorry. What's your question again?
Q. Your son --
A. Uh-huh.
Q. -- he has been given, in his account, at least $30,000 from your business.
A. Uh-huh.
Q. But yet you only make about $20,000. How is that?
A. He is good salesman. He sells -- he sell a bunch of car, not for just -- he sell for United, he sell a few for -- he making commission.

***

Q. Does he sell cars now, or in the past?
A. No, in the past.
Q. When did he sell them?
A. Before he -- before he got engaged, 2012.
Q. Okay. The money he got for the down payment on the house, do you know where it came from?
A. It came from the -- from my own brother.
Q. Okay.
A. United Auto, yes.
Q. What else do you do besides sell cars there?
A. Auto repair.
Q. And what else besides auto repair, sell cars, what else?
A. That's it.

In January 2017, the Trial Court entered its final decree granting Wife a divorce based upon the ground of inappropriate marital conduct. In a separate permanent parenting plan entered, Wife was designated primary residential parent of the Child, keeping the Child with Wife 285 days per year to Husband's 80. In its decree, the Trial Court stated, in relevant part:

-10-

5. That the parties stipulated the marital home's fair market value is $264,000.00, with a mortgage of $174,864.32. Further, the parties stipulated to an equity in the amount of $89,135.68. The proceeds from the sale of the marital home shall be divided equally between the parties with Husband receiving 50% and Wife receiving 50%. The marital home shall be listed for sale with Realtor, George Weeks, as the agent, to be sold within five (5) months. If the marital home is not sold by agreement during said five (5) months, then it shall be placed with Auctioneer, Jay Cash, to be placed up for auction.

6. That until such time as the marital home is sold, Husband shall remain in the home. Husband shall be responsible for the mortgage, utilities and day-to-day maintenance of the marital home until it is sold.

***

11. That the Court finds there is no proof of a physical assault, of physical abuse, committed by Husband upon Wife;

12. That during the marriage, Wife's Mercedes was sold for $4,500.00. She loaned $2,000.00 to Husband, giving her a profit of $2,500.00. Then, following Wife's graduation from college, Husband gifted Wife with a Cadillac, which was titled in his father's name. Later, Husband's father took the car back and sold it. The value on said car was listed as $15,900.00. Therefore, minus the $2,500.00 Wife made from the sale of her Mercedes, Husband shall reimburse Wife with $13,400.00 to compensate for the loss of the Cadillac;

***

14. That Wife's income is $59,500.08 per year, being $4,958.34 per month. Husband's income is $69,883.04, being $45,383.04 from his job at Nissan and $24,500.00 from his work with his father, being a total of $5,823.59 per month;

15. That regarding custody of the parties' minor child, and pursuant to TENN. CODE ANN. §36-6-106, the Court finds as follows:

a. That through no fault of Husband, regarding the strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child, falls in favor of Wife;

b. That concerning each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a

close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child, this factor falls in favor of Wife. However, the Court notes that Wife's claims of fear about Husband is called into question, as she allowed Husband parenting time over the Thanksgiving Holiday as it was convenient for her;

***

e. That concerning the degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities, this factor falls in favor of Wife, even though Husband has expressed the desire to have more time and responsibility;

f. That concerning the love, affection, and emotional ties existing between each parent and the child, this factor is equal between the parties. It is noted the minor child has not been around Husband as much as Husband wanted him to be;

***

16. That Husband should have been seeing his child a whole lot more than he's been seeing the child. Husband should have been with the child just as much as Wife to have opportunities to be with and around the child and there is nothing that indicated from the presentation of the evidence before the Court that would have restricted Husband in any way;

17. That Wife is hereby named Primary Residential Parent, and her school zone will be the school zone for the child;

18. That Husband shall have residential parenting time from 9:00 a.m. on Saturday morning until noon on Monday every other weekend. If the Father's Monday falls on one of the Monday holidays, he will keep the child until the following Tuesday at noon;

19. That Wife shall transport the child to Husband on Saturday mornings at 9:00 a.m. and Husband shall transport the child to Wife on Monday, or Tuesday following a Monday holiday, if Father's Monday falls on one of the Monday holidays, at noon;

20. That Husband shall have the child for the first two (2) weeks in July and Wife shall have the child for the last two (2) weeks in July. Husband's residential time overrides the July 4th holiday;

21. That Husband shall have the child for the Thanksgiving Holiday in odd-numbered years and Wife shall have the child for Thanksgiving in even-numbered years;

22. That Wife shall have the child from December 19th at noon until December 26th at noon, and Husband shall have the child from December 26th at noon until January 5th at noon, every year;

23. That Wife shall have sole decision making regarding educational decisions, non-emergency health-care decisions and extracurricular decisions. However, Wife shall not enroll the child in any extracurricular activities that conflict with Husband's time and Husband's schedule. Further, Wife shall inform Husband within a reasonable amount of time of any doctor appointments or visits for the child;

24. That Wife can get a passport for the minor child and retain it. If Husband wants it, he can request if from Wife;

25. That should Husband's work schedule be changed from second shift to day shift, then his residential parenting time could be revisited;

In February 2017, the Trial Court entered an order awarding Wife a judgment for the $13,400 finding and holding Wife was entitled to payment for the Cadillac and also assessing court costs. In August 2017, in response to a show cause order issued by this Court, the Trial Court entered a final agreed order adjudicating all outstanding issues in the case. Husband appeals to this Court.

## Discussion

Although not stated exactly as such, Husband raises the following issues on appeal: 1) whether the Trial Court erred in denying Husband's request for equal parenting time; 2) whether the Trial Court erred in formulating a residential parenting plan that did not take into account the Child's school schedule for when the Child begins school in four years; 3) whether the Trial Court erred in imputing $24,500 to Husband's income for child support purposes; 4) whether the Trial Court erred in crediting Wife $400 for daycare expenses when the maternal grandmother testified she would be willing to watch the Child for free; and, 5) whether the Trial Court erred in awarding Wife $13,400 for the Cadillac Husband had presented to her as a gift.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Several of the issues on appeal implicate the abuse of discretion standard. In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Supreme Court discussed the abuse of discretion standard at length, stating:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No

-14-

Tenn. R. App. P. 11 application filed)).  When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

We first address whether the Trial Court erred in denying Husband's request for equal parenting time.  Husband argues that, in light of the statutory requirement that custody arrangements permit both parents to enjoy maximum participation in the child's life consistent with the child's best interest, the Trial Court found nothing to justify such an imbalanced grant of parenting time in Wife's favor.  Wife argues in response that Husband was abusive to her during the marriage and that, in addition, Husband's working the second shift at work means he would be unable to see the Child very much anyway.

Trial judges are afforded considerable discretion in arriving at the details of parenting arrangements.  *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013).  Courts are to utilize the following factors in custody determinations:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child.  In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.  The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents,

-15-

consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(2017).

The Trial Court's findings relative to this issue are favorable to both parents. The Trial Court found that Wife enjoyed a closer relationship with the Child because she was granted more time with the Child during the pendency of the case. Despite Wife's contentions, the Trial Court found no evidence of any physical abuse perpetrated by Husband. Given the Trial Court's findings, it is puzzling why the Trial Court entered a permanent parenting plan granting Husband only 80 days of parenting time with the Child per year to Wife's 285. In short, the permanent parenting plan entered by the Trial Court contradicts the Trial Court's own favorable findings regarding Husband. The evidence does not preponderate against these findings. Husband's late work schedule in itself does not justify such a minimal award of parenting time. Given the evidence in the record on appeal, the Trial Court's own findings, and the statutory goal of maximum participation for both parents in the life of the child, the Trial Court erred in granting Husband only 80 days per year with the Child. We, therefore, vacate the Trial Court's judgment as it relates to the residential schedule of the permanent parenting plan and remand for the Trial Court to award Husband significantly more time with the Child to comply with our General Assembly's mandate that the custody arrangement provides for both parents to have the maximum participation in their child's life as consistent with all relevant factors. On remand, the Trial Court is not required to award precisely equal time

to both parents, and we do not disturb the Trial Court's designation of Wife as primary residential parent.

In a related issue, we address whether the Trial Court erred in formulating a residential parenting plan that did not take into account the Child's school schedule for when the Child begins school in four years. We already have vacated the residential schedule ordered by the Trial Court. On remand, the Trial Court is not required to peer into the future to guess what the Child's school schedule will be, or indeed, what the status of both parents will be in four years. The Trial Court did not err in declining to account for as yet unascertainable future facts for when the Child reaches school age, and it need not attempt any such clairvoyance on remand.

We next address whether the Trial Court erred in imputing $24,500 to Husband's income for child support purposes. The Trial Court found that Husband earns $45,383.04 from Nissan and imputed $24,500 annual income to Husband from his work at his father's body shop. Husband argues that only the Nissan figure is reliable and should be used exclusively to establish his income, and that the imputed figure is groundless. Regarding imputing income for child support purposes, we have stated:

> The Tennessee Child Support Guidelines provide that income may be imputed to a parent when the court determines that the parent is voluntarily underemployed. *Wadhwani v. White*, No. M2015-01447-COA-R3-CV, 2016 WL 4579192, at *13 (Tenn. Ct. App. Aug. 31, 2016) (citing Tenn. Comp. R. & Regs. 1240-02-04-.04). The guidelines provide factors to be considered when determining whether a parent is willfully and voluntarily underemployed or unemployed. *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005). The factors include, *inter alia*, the parent's past and present employment; the parent's education, training, and ability to work; the parent's role as stay-at-home parent; and any additional factors deemed relevant to the particular circumstances of the case. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).

> The issue of voluntary underemployment is a question of fact that requires careful consideration of all the attendant circumstances. *Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008) (citing *Richardson*, 189 S.W.3d at 726). We afford the trial court considerable discretion in this determination. *Thayer v. Thayer*, No. M2015-00194-COA-R3-CV, 2016 WL 4056316, at *4 (Tenn. Ct. App. July 26, 2016) (citing *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001)). "The trial court's decision is entitled to a presumption of correctness, particularly 'when it is premised on the trial court's singular

-18-

ability to ascertain the credibility of the witnesses.' " *Id*. (citing *Reed v. Steadham*, No. E2009-00018-COA-R3-CV, 2009 WL 3295123, at *2 (Tenn. Ct. App. Oct. 14, 2009)).

*Ghorashi-Bajestani v. Bajestani*, No. E2016-00063-COA-R3-CV, 2017 WL 809880, at *9 (Tenn. Ct. App. March 1, 2017*), no appl. perm. appeal filed*.

The Trial Court heard testimony at trial concerning Husband's father's business, and Husband's relationship with it. It is undisputed that Husband received money from his father. It is clear from the record that the Trial Court believed that this money was not merely a gift but rather that Husband actually worked at his father's business. Husband's father testified that Husband is a "good salesman" who earns "commission." Checks to Father from his father's business, United Auto, even reference specific cars in the notation as having been sold at United Auto. The Trial Court thus had a factual basis on which to conclude that Husband has worked and is fully capable of working as a salesman in addition to his job at Nissan. Given these findings by the Trial Court as to Husband's work history at United Auto during the parties' marriage, Husband is voluntarily underemployed. The evidence does not preponderate against any of the Trial Court's findings relevant to this issue. We affirm the Trial Court on this issue.

We next address whether the Trial Court erred in crediting Wife $400 for daycare expenses when the maternal grandmother testified she would be willing to watch the Child for free rather than put the Child out on the street. The maternal grandmother did testify that she would watch the Child for free rather than let him roam unattended, if it came to that. However, the fact remains that Wife does pay her mother $400 per month to watch the Child. That the grandmother would not abandon the Child if Wife stopped paying does not mean that Wife should not be credited for the money she pays her mother to watch the Child. We affirm the Trial Court as to this issue.

The final issue we address is whether the Trial Court erred in awarding Wife $13,400 for the Cadillac Husband had presented to her as a gift. Before we even reach the issue of valuation, we first must consider whether this property was classified correctly. Marital property is defined as "[A]ll real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . ." Tenn. Code Ann. § 36-4-121 (b)(1)A)(2017). The Cadillac was not owned by Husband even though he presented it to Wife as though it were a gift. The Cadillac originated with Husband's father who eventually repossessed it. We believe the Trial Court placed undue emphasis on the presentation of the Cadillac as a gift. One may place a bow on something and present it to someone but that does not

-19-

mean he or she owns the item and is in a position to give it to someone as a gift. We find that the Cadillac was not marital property subject to division in the first place.

When Wife's Mercedes was sold for $4,500, she received $2,500 to go toward her tuition. Wife contends the remaining $2,000 was given to Husband's father as a loan. Husband states it went toward another vehicle. In any event, Wife did not receive the $2,000. Therefore, we modify the Trial Court's judgment to Wife of $13,400 to $2,000 to account for the $2,000 Wife never received from Husband's sale of her Mercedes.

In summary, we vacate the residential parenting schedule entered by the Trial Court and remand for the Trial Court to award Husband significantly more time with the Child. The current residential parenting schedule entered by the Trial Court, however, will be followed until the Trial Court promptly complies with our decision to enter a new parenting schedule. We also modify the Trial Court's monetary judgment to Wife from $13,400 to $2,000. We affirm the Trial Court on all other matters.

### Conclusion

The judgment of the Trial Court is affirmed as modified, in part, and vacated, in part, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed one-half equally between the parties, the Appellant, Waleed Fawzi Abed, and his surety, if any, and the Appellee, Wafa Badawi Hindiyeh.

_____
D. MICHAEL SWINEY, CHIEF JUDGE